THIS DISPOSITION IS CITABLE
AS PRECEDENT OF THE TTAB
May 27, 1997
Paper No.
CEW

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

In re Bacardi & Company Limited
_____

Serial Nos. 74/534,897; 74/535,875; 74/535,192; 74/532,342;
74/532,527
_____

William R. Golden, Jr., Kelley, Drye & Warren for applicant.

David C. Reihner, Trademark Examining Attorney, Law Office
107 (Thomas Lamone, Managing Attorney).
_____

Before Sams, Quinn and Walters, Administrative Trademark
Judges.

Opinion by Walters, Administrative Trademark Judge:


Bacardi & Company Limited has filed five trademark

applications to register the marks HAVANA SELECT,[1] HABANA

CLASICO,[2] and OLD HAVANA[3] for "rum"; and HAVANA PRIMO[4] and

_____

[1] Serial No. 74/534,897, in International Class 33, filed June 8, 1994, based on a bona fide intention to use the mark in commerce. The application includes a disclaimer of the term SELECT apart from the mark as a whole.
[2] Serial No. 74/535,875, in International Class 33, filed June 8, 1994, based on a bona fide intention to use the mark in commerce. The application includes a disclaimer of the term CLASICO apart from the mark as a whole and a statement that the mark means "Havana Classic" in Spanish.
[3] Serial No. 74/535,192, in International Class 33, filed June 9, 1994, based on a bona fide intention to use the mark in commerce.

Serial No. 74/534,897; 74/535,876; 74/535,192; 74/532,342; 74/532,527

HAVANA CLIPPER[5] for "rum, distilled spirits specialty containing rum and prepared alcoholic cocktail containing rum." In the interest of judicial economy, as the issues in these five appeals are identical and the facts are similar, we will consider the appeals together and render a single decision pertaining to all five applications.

The Trademark Examining Attorney has finally refused registration in each application under Section 2(e)(3) of the Trademark Act, 15 U.S.C. 1052(e)(3),[6] on the ground that applicant's marks are primarily geographically deceptively misdescriptive in connection with its proposed goods.

---

[4] Serial No. 74/532,342, in International Class 33, filed June 2, 1994, based on a bona fide intention to use the mark in commerce.
[5] Serial No. 74/532,527, in International Class 33, filed June 2, 1994, based on a bona fide intention to use the mark in commerce.
[6] The amendments to Section 2 of the Trademark Act of 1946 made by Public Law 103-183, 107 Stat. 2057, The North American Free Trade Enactment Act, apply to applications filed on or after December 8, 1993. Prior to these amendments, the prohibitions against registration on the grounds that a mark is primarily geographically descriptive or that a mark is primarily geographically deceptively misdescriptive were contained in Section 2(e)(2) of the Act. Under the law as amended, the prohibition against registration on the ground that a mark is primarily geographically deceptively misdescriptive is contained in Section 2(e)(3) of the Act, which is applicable to the cases herein. The legal standard for determining this issue has not changed, although marks found to be primarily geographically deceptively misdescriptive are no longer eligible for registration under the provisions of Section 2(f) of the Act, subject to certain grandfather provisions.
      While we do not consider herein the propriety of a refusal to register in these cases under Section 2(a), we note, additionally, that changes were made to Section 2(a) by Public Law 103-465, §522, 108 Stat. 4982, the Uruguay Round Agreement Act, signed into law on December 8, 1994, and effective January 1, 1995. The amendment adds an absolute prohibition against the registration, in connection with wines or spirits, of a mark that includes a geographic indication if the wines or spirits do not originate in that geographic area. This prohibition applies to all such uses which first commence on or after January 1, 1995. While the intent-to-use applications herein were filed and examined prior to the effective date of the noted amendments to Section 2(a), if applicant was to submit an amendment to allege use or a statement of use in any of these applications indicating that use of the mark commenced subsequent to January 1, 1995, it would be appropriate

Serial No. 74/534,897; 74/535,876; 74/535,192; 74/532,342; 74/532,527

Applicant has appealed.  Both applicant and the Examining Attorney have filed briefs in each case, but oral hearings were not requested.  We affirm the refusals to register.

In order for registration to be properly refused under Section 2(e)(3), it is necessary to show that (i) the mark sought to be registered is the name of a place known generally to the public; and that (ii) purchasers are likely to believe, mistakenly, that the goods or services sold under applicant's mark have their origin in or are somehow connected with the geographic place named in the mark.  *In re Nantucket, Inc.,* 677 F.2d 95, 213 USPQ 889 (CCPA 1982). *See also*, *In re California Pizza Kitchen, Inc*., 10 USPQ2d 1704 (TTAB 1988), citing *In re Societa Generale des Eaux Minerals de Vittel S.A*., 824 F.2d 957, 3 USPQ2d 1450 (Fed. Cir. 1987).

---

for the Examining Attorney to consider whether to refuse registration under the provisions of Section 2(a) as amended by P.L. 103-465.

Serial No. 74/534,897; 74/535,876; 74/535,192; 74/532,342; 74/532,527

*Marks Convey Primarily Geographic Connotation.*

With regard to the first prong of the test, there is no genuine issue that HAVANA[7] is the name of a major city in Cuba. Applicant contends that the term HAVANA does not convey primarily a geographic meaning; rather it "evokes an historic and stylistic image," associated with a "pre-Castro free-wheeling lifestyle." However, applicant has submitted absolutely no evidence to establish in this record that the relevant purchasers would make such an association. Further, even if applicant had established an association between HAVANA and a particular lifestyle, such association would not contradict the primary geographic significance of the term, as the association may be made precisely because of the primary significance of HAVANA as a city in Cuba.

Further, we conclude that the additional term added to the proposed mark in each application does not detract from the primary geographic significance of each of the proposed composite marks. *See, In re Chalk's International Airlines Inc.,* 21 USPQ2d 1637, 1639 (TTAB 1991). Moreover, as the Board has stated in the past, the determination of registrability under Section 2(e)(2) [and, now, Section 2(e)(3)] should not depend on whether the mark is unitary or

---

[7] The record shows that HABANA, which is the relevant term in the proposed mark HABANA CLASICO, is the Spanish term for HAVANA. We find HAVANA and HABANA to be equivalent and, thus, the geographic significance of the terms is the same. The record contains no evidence to indicate otherwise. Our discussion herein pertaining to HAVANA pertains equally to HABANA.

4

Serial No. 74/534,897; 74/535,876; 74/535,192; 74/532,342; 74/532,527

composite. *See, In re Cambridge Digital Systems*, 1 USPQ2d 1659, 1662 (TTAB 1986).

*HAVANA SELECT, HAVANA CLASICO, HAVANA PRIMO.*

The Examining Attorney contends that the terms SELECT, CLASICO and PRIMO, in, respectively, the marks HAVANA SELECT,[8] HABANA CLASICO[9] and HAVANA PRIMO[10] are laudatory and/or descriptive in connection with the identified goods. Applicant has entered disclaimers of the terms SELECT and CLASICO in the respective applications, although it is applicant's contention that these additional terms emphasize the lifestyle connotation of HAVANA. Notwithstanding the disclaimers of record, the record supports the conclusion that these terms would be perceived merely as type or grade designations in connection with the identified goods, such that these terms do not alter the primary geographic significance of the composite marks.

*OLD HAVANA.*

Similarly, regarding the proposed mark OLD HAVANA, the addition of the term OLD to the geographic term HAVANA

---

[8] The Examining Attorney submitted a definition of SELECT as "adj. choice; of special excellence" from *The Random House College Dictionary* (1973), and contends that SELECT is descriptive in relation to alcoholic beverages.

[9] The record shows that CLASICO is the Spanish term for CLASSIC. The Examining Attorney submitted a definition of CLASSIC as "adj. of the first or highest class or rank" from *The Random House College Dictionary* (1973), and contends that CLASICO is a laudatory or descriptive term indicating that applicant's rum is "first-class or highly valuable."

[10] The Examining Attorney submitted a definition of PRIMO as "slang a. first-class, b. highly valuable or most essential" from *The Random House College Dictionary* (2d ed. 1993), and contends that PRIMO is a laudatory term indicating the quality of applicant's alcoholic beverages.

5

Serial No. 74/534,897; 74/535,876; 74/535,192; 74/532,342; 74/532,527

simply either describes a characteristic of the city or refers to a section of the city. Thus, OLD reinforces the geographic significance of the composite mark.

*HAVANA CLIPPER.*

Regarding the mark HAVANA CLIPPER, the Examining Attorney submitted a dictionary definition[11] of CLIPPER, noting the entry "4. a person or thing that moves along swiftly"; however, we note, also, the entry "5. a sailing vessel built and rigged for speed, esp. a type of three-masted ship built in the U.S. from c1845." The Examining Attorney contends that the composite mark implies that "applicant's products are so good that the consumption of the beverages move along swiftly" (Office Action, June 9, 1995). On the other hand, applicant contends that the composite mark is evocative of "the fast-sailing clipper ships that used to ply the waters of the Caribbean" (applicant's response, April 20, 1995). We are inclined to agree with applicant that, as HAVANA is located in the Caribbean, the connotation of HAVANA CLIPPER is more likely to be of Caribbean sailing vessels that may sail out of HAVANA. There is no evidence that there is a type of ship called a HAVANA CLIPPER or a famous ship named the HAVANA CLIPPER, such that the geographic significance of HAVANA

---

[11] *The Random House College Dictionary* (1973).

Serial No. 74/534,897; 74/535,876; 74/535,192; 74/532,342; 74/532,527

would be diminished.[12]  On the record, we conclude that the term CLIPPER does not detract from the primary geographic significance of HAVANA as a city in the Caribbean and, thus, the primary significance of the composite mark remains geographic.

*Goods/Place Association.*

We turn, then, to the question of whether purchasers are likely to make a goods/place association between the geographic place named in applicant's marks and the identified goods.  We answer that question in the affirmative.  The Examining Attorney has submitted evidence from dictionaries, encyclopedias and gazetteers indicating that HAVANA, Cuba, is a major city which produces a variety of goods, among which "rum" is listed as a significant product.  Applicant has alleged that its family name, Bacardi, is widely associated with rum that is historically from Cuba and that U.S. consumers associate a certain popular style of rum as originating in Cuba.  We find sufficient evidence herein to conclude that a goods/place association is likely to be made by purchasers between HAVANA, the major city in Cuba, and the rum products identified in these applications.  Thus, purchasers are likely to believe that the rum products to be sold under the proposed marks originate in HAVANA, Cuba.

---

[12] We do not suggest that, if the record contained such information, we would necessarily reach a different conclusion regarding the geographic

7

Serial No. 74/534,897; 74/535,876; 74/535,192; 74/532,342; 74/532,527

*Ground for Refusal.*

At this juncture in our analysis, we note that, if applicant's goods, in fact, originated in Cuba, the marks herein would be appropriately refused registration under Section 2(e)(2) of the Act, on the ground that such marks would be primarily geographically descriptive in connection with the identified goods. However, in these cases, applicant admits that it does not produce rum in Cuba and that applicant is presently legally precluded from distributing rum originating in Cuba in United States commerce. Thus, we agree with the Examining Attorney that the marks herein are properly refused registration, under Section 2(e)(3), on the ground that such marks are primarily geographically deceptively misdescriptive of the identified goods because purchasers' belief that the rum products to be sold under the proposed marks originate in HAVANA, Cuba, is a mistaken belief.[13]

*Applicant's Allegation of Extenuating Circumstances.*

Applicant contends, essentially, that extenuating circumstances warrant reversal of the refusal to register. Applicant states that it began its rum-producing business in Cuba and intends to resume producing rum in Cuba, and to use the proposed marks herein in connection with such rum, as

_____

significance of the composite mark.
[13] We find no evidence to support applicant's contention that, in view of the U.S. trade sanctions against Cuba, purchasers will know that no products on the U.S. market could originate in Cuba.

Serial No. 74/534,897; 74/535,876; 74/535,192; 74/532,342; 74/532,527

soon as legally and politically possible.  Applicant

explains its history and relationship to Cuba, stating that

"applicant is presently owned by descendants of Don Facundo

Bacardi, who over a century ago in Cuba originated a recipe

and process for the distillation and manufacture of rum that

is sold under the BACARDI name and mark" and that "[o]n

October 14, 1960, the Cuban properties of applicant's

predecessor were unlawfully expropriated" (Applicant's

response, April 20, 1995); that applicant is a well-known

producer of Cuban rum, which is now produced elsewhere

according to the same formulae and processes that have been

handed down over the past 130 years in the Bacardi family;

that applicant originated the "light style of rum, aged and

carefully blended" that applicant alleges is popular in the

United States; and that applicant intends to produce rum in

Cuba, where applicant's rum business began, "[w]hen the

President of the United States, pursuant to the Cuban

Democracy Act of 1992, 22 U.S.C.A. Section 6007(b),

certifies that a democratic government has been re-

established in Cuba such that the U.S. trade embargo with

Cuba is lifted" (Applicant's response, *supra*).  Applicant

submitted no evidence in support of its statements.

Applicant states, in its brief, that:

to refuse to allow intent-to-use applications
. . . because of the current embargo, unfairly
prejudices companies . . . that adhere to U.S.
law.  Cuban state-run trading companies, many of

9

Serial No. 74/534,897; 74/535,876; 74/535,192; 74/532,342; 74/532,527

      which operate out of facilities confiscated by Castro from pre-Castro Cuban free enterprises, are unfairly favored, because they are presumably permitted to register such marks in the United States on an 'intent-to-use' basis or under treaty rights even though they cannot have a present *bona fide* intent to use those marks in interstate commerce within the United States as the embargo does not permit such usage.  Such a policy unfairly favors the anti-democratic, Communist-controlled business entities in Cuba, by permitting them, in effect, to register marks that arguably evoke the rich heritage of Cuban history and culture, while denying the expatriate Cuban businesses that helped build that heritage from registering marks . . . that evoke a pre-Castro, Cuban lifestyle.  Such a policy is contrary to the Cuban Democracy Act, which is intended to promote the adoption of a democratic government in Cuba.

Applicant asserts that "[i]n view of recent events, it is quite possible that the policy of the U.S. government as expressed in federal law will be effective and within [the] thirty months [that an intent-to-use applicant is permitted after allowance in which to use a mark] democracy will be re-established in Cuba" and, thus, the refusal to register will be moot.[14]

      We find applicant's position to be unpersuasive of a different result herein as it is based on a number of misconceptions.  First and foremost, regardless of the existence of trade sanctions against Cuba, we have determined that the marks herein would be subject to refusal

---

[14] As applicant notes, the provisions establishing and defining the terms of the trade sanctions, or "embargo," against Cuba can be found in the Trading With The Enemy Act, 50 U.S.C.A. App. § 16(b)(1), the Cuban Democracy Act, 22 U.S.C.A. 6001 *et. seq*. and the Cuban Asset Control Regulations, Chapter 31 C.F.R. Part 515.

10

Serial No. 74/534,897; 74/535,876; 74/535,192; 74/532,342; 74/532,527

under either Section 2(e)(2),[15] if the identified goods are intended to originate in HAVANA, or Section 2(e)(3),[16] if the identified goods are not intended to originate in HAVANA. Thus, if circumstances change so that applicant can indicate a present intention to manufacture the goods to be identified by the proposed mark in Cuba, the Examining Attorney would be likely to withdraw the basis for the refusal to register herein under Section 2(e)(3) of the Act and refuse registration, instead, under Section 2(e)(2) of the Act.[17]

Similarly, we see no basis for applicant's allegations of prejudice. A so-called Cuban state-run trading company applying to register in the United States the marks herein on the basis of a *bona fide* intention to use such marks in commerce, in connection with the identified goods herein, would be subject to the same examination and same refusals to register as applicant. The fact that such company would likely indicate its intention for its identified goods to originate in HAVANA, Cuba, would result in the refusal,

---

[15] As previously stated, the composite marks herein are primarily geographic in connotation; HAVANA, the place named in the marks, is known generally to the public; and purchasers would be likely to believe that the identified goods originate in, or are somehow connected with, HAVANA.

[16] As previously stated, the composite marks herein are primarily geographic in connotation; HAVANA, the place named in the marks, is known generally to the public; and purchasers would be likely to believe, mistakenly, that the identified goods originate in, or are somehow connected with, HAVANA.

[17] A mark refused registration under Section 2(e)(2) may be registrable on the Supplemental Register, under Section 23, or it may be registrable on the Principal Register with a showing of acquired distinctiveness under Section 2(f).

11

Serial No. 74/534,897; 74/535,876; 74/535,192; 74/532,342; 74/532,527

based on the geographic significance of the marks, being made under Section 2(e)(2), rather than, as herein, under Section 2(e)(3). Presumably, the sanctions contained in the relevant laws and regulations pertaining to Cuba would present the same problems to any intent-to-use applicant (*i.e.,* the uncertainty that the required use of the mark in commerce between the United States and Cuba could occur within the timeframe mandated in the Trademark Act so that the intent-to-use application could mature into a registration).

The Cuban Asset Control Regulations ("the Regulations"), at 31 C.F.R. 515.527, permit certain transactions with respect to the filing of trademark applications and maintenance of trademark registrations. Certain special procedures pertaining to such transactions are detailed in the Regulations; however, in all other respects, the procedural and substantive provisions of the Trademark Act and relevant law and regulations must be met.[18]

Finally, we note that, to the extent applicant is arguing that substantive examination of an application should be deferred until a statement of use is filed,

---

[18] Thus, for example, the most likely statutory basis for filing a trademark application, subject to the Regulations, would be under Section 44 of the Act, based on a foreign filing or registration in a country that is a party to the Paris Convention and/or the World Trade Organization. Further, an existing registration, which is subject to the Regulations, would be subject to the maintenance provisions in

12

applicant's position is not well-taken.  While it is not the case herein, even if an uncertain future event could render a substantive refusal moot, the Examining Attorney is required to conduct, to the fullest extent possible, a substantive examination of an application, regardless of whether it is based upon Sections 1(a), 1(b) or 44 of the Act, prior to passing the application to publication for opposition.  *See, In re Parfums Schiaparelli Inc*., 37 USPQ2d 1864 (TTAB 1995); and *In re American Psychological Association*, 39 USPQ2d 1467 (Comm'r. 1996).  Thus, the Examining Attorney properly considered the issue of geographic descriptiveness during his examination of the subject applications.  Further, applicant admitted that, at the time of filing the applications and during the examination thereof, it was legally precluded from producing the identified products in Cuba.  Therefore, the Examining Attorney properly considered those facts, rather than considering applicant's allegations of possible future occurrences, and correctly refused registration under Section 2(e)(3) of the Act, on the ground that the marks herein are primarily geographically deceptively misdescriptive in connection with the identified goods.

*Decision:*  The refusal under Section 2(e)(3) of the Act is affirmed as to each application.

---

Sections 8 and 9 of the Act, permitting a showing of nonuse due to

Serial No. 74/534,897; 74/535,876; 74/535,192; 74/532,342; 74/532,527


J. D. Sams


T. J. Quinn



C. E. Walters
Administrative Trademark Judges,
Trademark Trial and Appeal Board

special circumstances.